IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KITSAP COUNTY

| | |
|---|---|
| BAINBRIDGE TAXPAYERS UNITE, a Washington non-profit corporation; LEE ROSENBAUM, an individual; JANICE PYKE, an individual; and MICHAEL POLLOCK, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF BAINBRIDGE ISLAND, a municipal corporation; KOLBY MEDINA, an individual; MORGAN SMITH, an individual; and JOHN AND JANE DOES 1-100, other unknown individuals or legal entities who participated in the complained of conduct,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(C), (D) VIOLATION OF WASHINGTON'S CODE OF ETHICS FOR MUNICIPAL OFFICERS, AND DECLARATORY RELIEF** |

COMES NOW Plaintiff Bainbridge Taxpayers Unite, a Washington non-profit corporation ("BTU"), Lee Rosenbaum, an individual ("Rosenbaum"), Janice Pyke, an individual ("Pyke"), and Michael Pollock ("Pollock"), an individual, by and through their attorneys in this matter, Buchalter, a Professional Corporation, and for causes of action against Defendants The City of Bainbridge Island, Kolby Medina, Morgan Smith, and John and Jane Does, 1-100, individuals and legal entities not known at this time but who participated in, or benefited from, the illegal conduct described in this Complaint (collectively, "Defendants"), allege as follows:

# I. PARTIES

1. Plaintiff Bainbridge Taxpayers Unite is a Washington nonprofit corporation consisting of individuals who reside in the City of Bainbridge Island who have been, and will continue to be, directly impacted by the illegal actions of the Defendants.

2. Plaintiff Lee Rosenbaum ("Rosenbaum") is an individual and a resident of the City of Bainbridge Island who has been impacted by the illegal actions of the Defendants.

3. Plaintiff Janice Pyke ("Pyke") is an individual and a resident of the City of Bainbridge Island who has been impacted by the illegal actions of the Defendants.

4. Plaintiff Michael Pollock ("Pollock") is an individual and a resident of the City of Bainbridge Island who has been impacted by the illegal actions of the Defendants.

5. Defendant the City of Bainbridge Island (the "City") is a Washington State municipal corporation.

6. Defendant Kolby Medina ("Medina") is a former member of the City Council and the former mayor of the City.

7. Defendant Morgan Smith ("Smith" or "City Manager") is the former City Manager.

8. John and Jane Does 1-100 are unknown individuals and legal entitles who participated in, or benefited from, the illegal conduct described in this Complaint.

# II. JURISDICTION AND VENUE

9. This Court has original jurisdiction over this action pursuant to RCW 2.08.010.

10. Venue is proper in this Court pursuant to RCW 4.12.020 because the cause arose in Kitsap County.

# III. FACTS

**A. Medina and Smith Lobby for the Purchase of HMC Property, Conceal Conflicts of Interest, and Misrepresent Alternatives.**

11. For years, the City has been planning to build a Police and Municipal Court replacement facility (the "Police-Court Facility"). The City hired Coates Design, Inc. ("Coates")

to evaluate several potential sites for the Police-Court Facility, notwithstanding the fact that Coates had no prior experience with municipal buildings.

12. In 2013, Harrison Medical Center ("HMC") purchased real estate at 8804 Madison Avenue N in Bainbridge Island (the "Property") for $1,750,000 and built a dedicated health care facility on the Property. Based on various reports, the health care facility lost money every year after opening, and HMC was desperate to sell the Property and avoid ongoing extensive operating losses. Upon information and belief, with losses mounting, HMC began exploring ways to dispose of the liability, through discussions with Medina and John and Jane Does, to be discovered through this litigation.

13. Medina was not only the City's mayor and a member of City Council, but also an attorney with a private practice, specializing in work for non-profit entities such as hospitals. Upon information and belief, he has performed or overseen the performance of work for HMC and its parents, affiliates, agents, principals, executives and employees. At all times relevant to this complaint, he thus had a financial relationship with and interest in HMC.

14. Upon information and belief, by at least 2017, representatives of HMC, namely senior members of its parent company, CHI Franciscan Health, directly approached City representatives and made unsolicited offers to sell its failing health care facility to the City for use as the new Police-Court Facility. The reason was obvious: the health care facility was failing and CHI Franciscan Health sought to avoid the ongoing liability in order to focus on its new "strategic partnership" with Virginia Mason at Bainbridge Island Medical Center.

15. In March 2018, the City Council held a meeting at which the City's purchase of a site for the new Police-Court Facility was discussed, moving out of the back room as Medina had clearly been discussing material deal terms with individuals associated with HMC. At the meeting, without disclosing his ongoing work for and financial relationship with HMC or others who stood to benefit from its sale of the Property, Medina—at that time the City's mayor—pressured the

members of the City Council to consider only the HMC site, rather than a competing site at Yaquina Avenue (owned by Plaintiffs Rosenbaum and Pyke), that was a superior option.

16. Among other things, Medina, the City Manager (Smith), and their staff reported that choosing the Yaquina site, "could cost an estimated $34 million, excluding land costs, according to Coates," while the HMC site could cost as little as $15.3 million. As Medina, Smith, and their staff knew, these representations were material, false, and intentionally misleading, did not properly represent the alternatives to the HMC purchase, and were made with the sole purpose of inducing the City Council to vote to purchase the Property from HMC.

17. Medina voted to move forward with the HMC site, but he was outvoted by four other members of the then City Council, who wondered out loud why Medina was exerting so much pressure to complete a sale, and consider only one option. The purchase was thus not approved at that time.

18. During this process, Medina and Smith knew that Medina's financial relationship with and interest in HMC created a conflict of interest that made his involvement in the selection of the site for the Police-Court Facility illegal. Yet they concealed that conflict from the City Council as part of their effort to cause it to choose the HMC site. They also concealed the fact that Coates, on whose projections they based their arguments for the HMC site, stood to gain financially if that site was chosen.

**B.    Medina and Smith Persuade the City Council to Purchase the HMC Property.**

19. In 2018 and 2019, Medina was the President and CEO of the Kitsap Community Foundation ("KCF"), a non-profit organization that fundraises and provides funding to other local non-profits. In that role, Medina developed donor relationships, encouraged future donations, and grew KCF's endowment. In 2018, Medina's total compensation from KCF was almost $100,000, all of which was paid by donations to the entity, and was its single largest expense.

20. As of January 2019, KCF and HMC shared a number of senior leaders and other members. Around the same time, HMC leadership, including its former President, David Schultz,

as well as others involved in CHI Franciscan Health, made substantial donations to, and were otherwise involved in, KCF.

21. In January 2019, the City Council again met and considered the two alternatives for the new Police-Court Facility: 1) purchasing and remodeling the Property, consisting of the land and existing HMC building (the "Harrison Proposal"); or 2) purchasing and building a new facility at Yaquina Avenue (the "Yaquina Proposal") (collectively, the "Police-Court Facility Proposals").

22. Under the Harrison Proposal, the Property would need to be gutted because its existing use as a medical facility did not translate at all to a police station.[1]  Medina and Smith repeatedly represented to the City Council that the total cost of the Harrison Proposal, including purchase of the Property and the necessary gutting, would be no more than $20,000,000, while the total cost of the Yaquina Proposal would be $28,000,000.[2]

23. As Medina, Smith, and their staff knew, these representations were material and false.  The actual projected cost to actually gut and retrofit the HMC facility and build a police-court facility would far exceed the represented $20,000,000, as that figure included the value of land appraised for use as a medical building, not a police-court facility.  Medina, Smith and Coates all knew the appraisals were flawed, but did not disclose this fact because had they done so, they would have had to concede the most the HMC site was worth was $3,000,000 "as is".  That means the City would end up paying $6,000,000 more for the HMC site than it was worth at the outset, before the additional $11,000,000 they (falsely) represented would be necessary to gut and retrofit the building.  By contrast, the actual projected cost of the Yaquina Proposal was $12,000,000 (after land acquisition cost of about $1,200,000) or a total of $13,200,000, versus at least $20,000,000 for the Harrison Proposal (paid almost $9,000,000 and then another $11,000,000 to gut and retrofit).

---

[1] HMC is located behind an assisted living center and a church, making ingress and egress difficult.

[2] During its March 20, 2018 presentation to the City Council, Coates estimated the Yaquina Proposal would cost between $25 and $34 million.

COMPLAINT - 5

24. At no time did Medina, Smith or their staff advise the other councilmembers that the HMC facility would cost at least $6,800,000 more to purchase and develop than Yaquina.

25. Medina and Smith also minimized the fact that the Yaquina Proposal was for a significantly larger police-court facility (28,472 square feet) than the Harrison Proposal (17,981 square feet), further and substantially skewing the numbers towards the Harrison Proposal. If the HMC site were the size of the proposed Yaquina facility (27,472 square feet), the cost to gut and retrofit the additional 10,491 square feet would have added another $6,930,000 (63%) to the Harrison Proposal. Thus, an apples-to-apples comparison would have put the Yaquina Proposal at $13,200,000 and the Harrison Proposal at $27,000,000, as opposed to the bogus comparison presented by Medina, Smith and their staff.

26. On January 29, 2019, a special City Council meeting was held to decide between the Harrison and Yaquina Proposals. Without disclosing his financial interests in the matter, or the misleading nature of the projected costs of the competing proposals that he and others had provided, and while falsely claiming that the Harrison Proposal would save the City $8,000,000 over the Yaquina site (**as opposed to costing the City at least $6,800,000 more**), Medina persuaded members of the City Council to vote in favor of the Harrison Proposal instead of the Yaquina Proposal. The City Council voted 4-3 in favor of the Harrison Proposal, **with Medina casting the deciding vote**.

27. In addition to the misrepresentations and omissions described above regarding the costs of the two proposed sites, Medina also failed to disclose to the City Council that he had conflicts of interest that would preclude him from voting on the Police-Court Facility Proposals, and he failed to recuse himself from the vote.

28. Medina knew this conduct violated the Bainbridge Island Municipal Code, as well as Washington criminal and civil statutes.

**C.     The Deal Closes and the City Massively Overpays for the Property Because It Was Appraised as a Medical Building and Not a Police Station.**

29.    On January 31, 2020, the City moved forward and purchased the Property from CHI Franciscan (the "Contract"). Outside of City Council and outside of the public's view, Medina improperly negotiated the sale price of the Property with HMC, which he then presented to the City Council. He has never explained why he was permitted to engage in these back-room negotiations, which violated Washington State Public Meeting Laws.

30.    The results were predictable: the City ultimately paid $8,975,000, even though the Property appraised for far less in three independent appraisals performed for the City by certified appraisers—first for $7,520,000, then for $7,600,000, and finally for $7,040,000. Even those appraisals were inflated, as each assumed continued use as a going medical facility, not a police station or any other remodeled office building, and none of the appraisals accounted for the significant demolition and retrofitting that would be required to use the Property for the Police-Court Facility at the specific request of City management. Upon information and belief, Medina and Smith instructed the appraisers to use those assumptions so the value would be artificially high, and look better in comparison to Yaquina. Had Medina and Smith properly disclosed the actual value as a future police station, the most the City should have paid for the HMC site was $3,000,000.[3] As a result, at the outset, the City lost $6,000,000 on the transaction.

31.    Medina and Smith's willingness to pay top dollar for the HMC site is particularly perplexing given an earlier offer by Smith to purchase Yaquina from Rosenbaum and Pyke for $600,000, half of its $1,200,000 value.

32.    Additionally, the City compounded the damages by financing this fiasco. The City decided to issue $8,645,000 in municipal bonds to cover the $7,000,000 shortfall, which would not have existed had it proceeded with the Yaquina purchase and development, creating interest

---

[3] One of the appraisals stated that if HMC were used as office space, the value would be $189 per square foot, or approximately $3,000,000. At best, demolished and retrofitted, the building's value for the intended use would be somewhere south of this figure.

COMPLAINT - 7

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

payments on those bonds which exceed $3,000,000.  Based on these two cash elements, before any costs to gut and retrofit, the cost of the HMC Proposal increased by $9,000,000 (value of purchase was a loss of $6,000,000 and cost of bonds to finance that loss was $3,000,000).

33. When factoring in the exorbitant purchase price for the Property, the bond costs, and the actual costs to renovate, **the deal will result in a total price tag to the City of more than $23,000,000.  Had the City Council, untainted by the misrepresentations and Medina, Smith, and Coates, chosen the Yaquina Proposal instead, the total price would have been $13,200,000.  <u>This misconduct has thus damaged the City and its citizens by at least $9,800,000</u>**.

### D. The City Refuses to Investigate.

34. This Complaint is not the first time this misconduct has been raised.  Indeed, the conflicts of interest are well documented in a formal Ethics Board Complaint that Ziontz Chestnut filed with the City.  *See* https://www.bainbridgewa.gov/AgendaCenter/ViewFile/Agenda/_12212020-1519, at pp. 30-42.  Pollock incurred approximately $8,000 in attorneys' fees associated with Chestnut's preparation of the Ethics Board Complaint.

35. In responding to the Ethics Board Complaint, the City admitted that Medina had violated the Ethics Code, but made clear that it was not interested in investigating the matter or evaluating its options, including contractual rescission as void as a matter of law, because Medina had moved on from his role as a councilman.  As a result, in violation of City rules and Washington State law, the City never investigated the Ethics Board Complaint and never brought action against Medina, Smith, or others involved, and never moved to rescind the purchase and sale agreement.

36. Many of Medina's conflicts were not disclosed at the City Council meeting that led to the vote.  City Attorney Joseph Levan ("Levan") was advised of the conflict and knew that it violated the Bainbridge Island Municipal Code and Washington State criminal and civil law.

37. Medina was well aware of the obligation to disclose conflicts of interest.  At a June 11, 2019 City Council meeting, before the Council adopted the Kitsap Humane Society's

recommended updates to the City's animal control code, Medina disclosed to the Council that KCF had made grants to the Kitsap Humane Society in the past (but that KCF had not received any donations from the Kitsap Humane Society). Levan advised that Medina should recuse himself from voting "if there's money going from one entity to another, if you think there's the potential for the perception of a conflict." Thus, Medina was well aware of conflict disclosure obligations, but failed to comply with them in the HMC transaction, because he knew disclosure would preclude him from voting on the Contract, and thus the HMC transaction would fail, as the Council would have been deadlocked. The Kitsap Humane Society conflict was far less significant than the conflict that existed relative to the Harrison Proposal, yet the Harrison Proposal conflict was never raised or disclosed by Medina, Smith, or Levan.

38. Had Medina made the necessary conflict disclosures before the Contract vote, by his own words, and those of Levan, he would not have been entitled to vote, and the Contract vote (to authorize the Letter of Intent) would have failed because the City Council would have been deadlocked on the transaction.

## IV.   FIRST CAUSE OF ACTION
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
### (AGAINST MEDINA AND SMITH)

39. Plaintiffs incorporate the previous allegations as though fully set forth herein.

40. Defendants Medina and Smith are each capable of holding a legal or beneficial interest in property, and therefore each is a "person" within the meaning of 18 U.S.C. § 1961(3).

41. The "Medina Enterprise" is an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4). It is engaged in, and its activities affect, interstate commerce. At all relevant times, Defendants Medina and Smith were associated in fact, and were employed by or associated with the Medina Enterprise. Upon information and belief, John and Jane Does 1-100 also were employed by or associated with the Medina Enterprise. This enterprise shall be referred to herein as the "Medina Enterprise."

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

42. The Medina Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The primary purpose of the Medina Enterprise was to exercise and preserve power over the City Council with respect to the Harrison Proposal for the financial and political benefit of Medina and Smith, both directly and indirectly through KCF, HMC, Coates and John and Jane Does.

43. For the purpose of 18 U.S.C. § 1962(c), and during the periods most relevant to this complaint, Medina and Smith each had authority within the Medina Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Medina Enterprise's affairs through the pattern of racketeering activity described below.

44. Medina and Smith agreed to and did conduct and participate in the conduct of the Medina Enterprise's affairs through a pattern of racketeering activity.

45. As part of the activity of the Medina Enterprise, Medina and Smith conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts:

 (a) With the intent to secure the Harrison Proposal, Medina offered or conferred pecuniary benefits upon Smith, in violation of Washington Criminal Code, RCW 9A.68.010(1)(a);

 (b) Medina knowingly offered, paid, or agreed to pay compensation to Smith for assistance in promoting the Harrison Proposal, in violation of Washington Criminal Code, RCW 9A.68.030(1)(b);

 (c) Medina and Smith accepted pecuniary benefits pursuant to an agreement or understanding that they would help secure the Harrison Proposal, in violation of Washington Criminal Code, RCW 9A.68.050(1)(b);

 (d) Medina was beneficially interested in the Harrison Proposal, impermissibly participated in the vote on the Harrison Proposal, and failed to disclose his

conflict of interest to the City Council, in violation of the Washington Code of Ethics for Municipal Officers, RCW 42.23.030 and RCW 42.23.040;

(e) In furtherance of a scheme or artifice to defraud the City and its taxpayers of money or property, and with specific intent to defraud, Medina and Smith knowingly used or caused to be used the mails and interstate wire communications, in violation of Title 18, United States Code, Sections 1341 and 1343;

(f) In furtherance of a scheme or artifice to defraud the City and its taxpayers of their honest services, and with specific intent to defraud, Medina and Smith knowingly used or caused to be used the mails and interstate wire communications, in violation of Title 18, United States Code, Section 1346;

(g) Medina and Smith used the mails to distribute the proceeds of an unlawful activity—specifically, bribery in violation of Washington law—and otherwise promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of that unlawful activity, in violation of the Travel Act, Title 18, United States Code, Section 1952.

46. The acts set forth above constitute bribery and/or extortion and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

47. Medina and Smith acted, and conspired to act together, and in association with others knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of enriching themselves both financially and politically and to otherwise further the ends of the Medina Enterprise.

48. The predicate acts described above were related to one another as part of a common scheme or plan.

49. Such unlawful conduct constituted a continuous pattern of racketeering activity beginning in or around 2017 through 2020, when Medina resigned from the City Council.

50. As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property. Medina and Smith's racketeering activities secured the Harrison Proposal over the Yaquina Proposal, directly resulting in the award of the Contract, and their racketeering activities were the proximate cause of the City's and BTU's damages (*i.e.*, overpaying by $6,000,000 for the new Police-Court Facility, bond costs and all the gutting and retrofitting costs, increasing the costs over the Yaquina Proposal by $9,800,000), Rosenbaum and Pyke's damages (*i.e.*, the $1,200,000 they would have received had the City selected the Yaquina Proposal over the Harrison Proposal), Pollock's damages (*i.e.*, the $8,000 he expended in attorneys' fees to file the Ethics Board Complaint) and also causing other damages which will be proven at the time of trial. These injuries were a foreseeable consequence of Medina and Smith's racketeering activities and violations of 18 U.S.C. § 1962(c).

51. Additionally, due to the City's failure to address the illegal actions of Medina and Smith, BTU's members expended significant funds in an unsuccessful effort to prevent the City from entering into the Contract and to have the Contract rescinded.

52. The City is under the continuing control and influence of the Medina Enterprise, as evidenced by the City's failure to take steps to void the Contract, notwithstanding the significant damage suffered by the City and its taxpayers.

## V.  SECOND CAUSE OF ACTION
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(d)
## (AGAINST MEDINA AND SMITH)

53. Plaintiffs incorporate the previous allegations as though fully set forth herein.

54. As set forth above, Medina and Smith agreed and conspired to violate 18 U.S.C. § 1962(c).

55. Medina and Smith have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Medina Enterprise through a pattern of racketeering activity. Each of those Defendants knew that his predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

56. As direct and proximate result of the conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that BTU's members, including Pollock, expended significant funds to prevent the City from entering into the Contract and to have the Contract rescinded, and the City did not purchase the Yaquina property from Rosenbaum and Pyke.

### VI. THIRD CAUSE OF ACTION
### VIOLATION OF WASHINGTON'S CODE OF ETHICS FOR MUNICIPAL OFFICERS
### (AGAINST MEDINA)

57. Plaintiffs incorporate the previous allegations as though fully set forth herein.

58. At all times relevant to this lawsuit, Defendant Medina was subject to Washington's Code of Ethics for Municipal Officers. *See* RCW 42.23.020(2).

59. Pursuant to RCW 42.23.030, "[n]o municipal officer shall be beneficially interested, directly or indirectly, in any contract which may be made by, through or under the supervision of such officer, in whole or in part, or which may be made for the benefit of his or her office, or accept, directly or indirectly, any compensation, gratuity or reward in connection with such contract from any other person beneficially interested therein."

60. Medina was beneficially interested in the Harrison Proposal and the Contract. KCF received substantial donations from HMC leadership, others from CHI Franciscan Health and others related in different ways to HMC, and those contributions helped fund Medina's salary. In exchange, Medina persuaded the City Council to vote in favor of the Harrison Proposal, which

relieved a failing medical center (HMC) and resulted in a sale of the Property for substantially more than all appraisals commissioned by the City.

61. Additionally, "[a] municipal officer may not vote in the authorization, approval, or ratification of a contract in which he or she is beneficially interested even though one of the exemptions allowing the awarding of such a contract applies. The interest of the municipal officer must be disclosed to the governing body of the municipality and noted in the official minutes or similar records of the municipality before the formation of the contract." RCW 42.23.030.

62. Notwithstanding his conflict of interest regarding the Harrison Proposal, Medina voted on the Harrison Proposal. Had he not voted on the Harrison Proposal, it would not have passed, and the Contract would not have been awarded. Medina did not disclose his conflict of interest to the City Council at the time of the vote or prior to the formation of the Contract.

63. Defendant Medina violated RCW 42.23.030 by failing to disclose his interest in the Harrison Proposal to the City Council and by failing to recuse himself from the vote on the Harrison Proposal.

64. Medina has also practiced law since at least 2001 and is currently an attorney at the Nonprofit Law Office—Nonprofitlawoffice.net—and previously the Medina Law Group, and upon information and belief, has provided paid for (profit) legal services to the Harrison Medical Center, CHI Franciscan, individuals associated with these legal entities and others who are named as John and Jane Doe defendant in this complaint.

65. Medina did not disclose work he was doing for individuals or entities prior to his vote on the Contract and being an expert in nonprofit law, would be well aware of the conflict of interest rules governing him as then Mayor of the City, and as reflected above.

66. Due to Medina's violations of RCW 42.23.030, the Contract is void pursuant to RCW 42.23.050.

## VII. FOURTH CAUSE OF ACTION
## UNIFORM DECLARATORY JUDGMENTS ACT
## (AGAINST THE CITY)

67. Plaintiffs incorporate the previous allegations as though fully set forth herein.

68. This Court has the power to declare the rights, status, and other legal relations among the parties to this matter.

69. BTU consists of interested persons under Washington's statutes who seek to obtain a declaration of rights, status, or other legal relations as to the contract between the City and CHI Franciscan for the purchase of the Property pursuant to the authority of the Uniform Declaratory Judgments Act, RCW 7.24 *et seq*.

70. Plaintiffs seek a declaration that the Contract is void pursuant to RCW 42.23.050 due to Medina's failure to disclose any of his conflict(s) of interest related to the Harrison Proposal to the City Council and his failure to recuse himself from the vote on the Harrison Proposal.

71. A declaratory order in this matter would terminate the uncertainty and controversy giving rise to the proceeding.

72. Based upon the above-stated allegations, Plaintiffs seek any and all relief available to it under Washington's Uniform Declaratory Judgments Act to include an order declaring Defendant Medina's conduct a violation of Washington's laws regarding the code of ethics for municipal officers, an order voiding the Contract, and an order enjoining the City from executing any further contracts arising out of the Harrison Proposal.

## VIII. REQUEST FOR RELIEF

Having fully set forth its Complaint, Plaintiffs respectfully request that the Court grant the following relief against Defendants:

1. All damages proven pursuant to RICO, trebled as permitted by law;

2. Punitive damages pursuant to RICO;

3. Enter a judgment declaring Medina's actions a violation of Washington's Code of Ethics for Municipal Officers statute;

4. Enter a judgment declaring the Contract void;

5. Enter an injunction barring the City from executing any further contracts arising out of the Harrison Proposal;

6. For recovery of attorneys' fees, costs, and expenses incurred in bringing this action as permitted by statute or common law;

7. For such other and further relief as this Court deems just and equitable.

DATED: June 2, 2022.

BUCHALTER
A Professional Corporation

*/s/ Bradley P. Thoreson*
Bradley P. Thoreson, WSBA No. 18190
Alexandra M. Shulman, WSBA #48888
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Phone: (206) 319-7052
Email: bthoreson@buchalter.com
Email: ashulman@buchalter.com

Joshua M. Robbins (To Be Admitted *Pro Hac Vice*)
1800 Von Karman Avenue, Suite 800
Irvine, CA 92612
Phone: (949) 224-6284
Email: jrobbins@buchalter.com

*Attorneys for Plaintiffs*

# FILED
## JUNE 7, 2022
## KITSAP COUNTY CLERK
## DAVID T. LEWIS III

KITSAP COUNTY SUPERIOR COURT IN AND FOR THE STATE OF WASHINGTON

| Plaintiff / Petitioner:<br>BAINBRIDGE TAXPAYERS UNITE, LEE ROSENBAUM, JANICE PYKE, and MICHAEL POLLOCK | Case No:<br>22-2-00875-18 |
|---|---|
| Defendant / Respondent:<br>THE CITY OF BAINDRIDGE ISLAND, KOLBY MEDINA, MORGAN SMITH, and DOES 1-100 | DECLARATION OF SERVICE |

The undersigned, being first duly sworn on oath deposes and says: That he/she is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen years, not a party to or interested in the above entitled action and competent to be a witness therein.

That on Mon, Jun 06 2022 at 02:04 PM, at the address of 280 Madison Ave N, within Bainbridge Island, WA, the undersigned duly served the following document(s): Summons, Complaint for Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Violation of Washington's Code of Ethics for Municipal Officers, and Declaratory Relief, Kitsap County Civil Case Information Cover Sheet in the above entitled action upon City of Bainbridge Island , by then and there, at the residence and usual place of abode of said person(s), personally delivering 1 true and correct copy of the above documents into the hands of and leaving same with Blair King, City Manager, authorized to accept Process Service.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct:

Date:  June 7th, 2022
       Job No. 7190662

Elliot Thordarson
Halo Messenger Services, LLC
1522 Western Ave
Seattle, WA 98101
206-300-9564

```
          FILED
    KITSAP COUNTY CLERK
    2022 JUN 13 PM 4:20
      DAVID T. LEWIS III
```

## KITSAP COUNTY SUPERIOR COURT IN AND FOR THE STATE OF WASHINGTON

| Plaintiff / Petitioner:<br>BAINBRIDGE TAXPAYERS UNITE, LEE ROSENBAUM, JANICE PYKE, and MICHAEL POLLOCK | Case No:<br>22-2-00875-18 |
|---|---|
| Defendant / Respondent:<br>THE CITY OF BAINDRIDGE ISLAND, KOLBY MEDINA, MORGAN SMITH, and DOES 1-100 | DECLARATION OF SERVICE |

The undersigned, being first duly sworn on oath deposes and says: That he/she is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen years, not a party to or interested in the above entitled action and competent to be a witness therein.

That on Tue, Jun 07 2022 at 04:03 PM, at the address of 4813 NE Dotson Loop, within Bainbridge Island, WA, the undersigned duly served the following document(s): Summons, Complaint for Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Violation of Washington's Code of Ethics for Municipal Officers, and Declaratory Relief, Kitsap County Civil Case Information Cover Sheet in the above entitled action upon Morgan Smith , by then and there, personally delivering 1 true and correct copy of the above documents into the hands of and leaving same with Morgan Smith .

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct:

Date:  June 8th, 2022
       Job No. 7190675

Elliot Thordarson
Halo Messenger Services, LLC
1522 Western Ave
Seattle, WA 98101
206-300-9564



22-2-00875-18
AFSR          4
Affidavit Declaration Certificate Confirmation of
12541523